**FEDERAL DEPOSIT INSURANCE CORPORATION, Petitioner,**

v.

**Willie R. COLEMAN and W. Dwayne Powell, Respondents.**

No. C–8272.

Supreme Court of Texas.

June 13, 1990.

Rehearing Overruled Oct. 24, 1990.

T. Ray Guy, Thomas J. Fisher, Dallas, for petitioner.

Kurt G. Paxson, El Paso, for respondents.

## OPINION

HECHT, Justice.

This is an action by the holder of a promissory note secured by a deed of trust lien on real property, against the guarantors of the note for the deficiency owed after foreclosure and sale of the security. The trial court granted summary judgment against the guarantors; the court of appeals reversed and remanded. 762 S.W.2d 243. The principal issue we address is whether, under the circumstances of this case, a secured creditor's failure to foreclose its lien promptly after the debtor's default on the note is a breach of any duty of good faith or fair dealing. We hold that it is not. Accordingly, we reverse the judgment of the court of appeals and affirm the judgment of the trial court.

## I

Judico Enterprises, Inc. executed a $460,-000 promissory note dated December 8, 1981, payable in one year with interest to the First National Bank of Midland. Judico's president, Willie R. Coleman, and secretary, W. Dwayne Powell, guaranteed payment of the note. Their guaranties stated in part:

Guarantors expressly waive diligence on the part of the said Creditor in the collection of any and all [of Judico's indebtedness]. . . .

.　　.　　.　　.　　.

The Creditor shall not be required to pursue any other remedies before invoking the benefits of this guaranty, especially it shall not be required to exhaust its remedies against endorsers, collateral and other security.

. . . [S]hould the Debtor execute in favor of said Creditor any collateral agreement, the exercise by the Creditor of any right conferred upon it in said agreement shall be wholly discretionary with the Creditor, and such exercise of, or failure to exercise, such right shall in no wise impair or diminish the obligations of the Guarantors hereunder.

Coleman and Powell were both controlling principals of Judico. Powell negotiated the note and guaranties and signed the note and deed of trust for Judico.

Six weeks before the note matured, on October 26, 1982, Judico voluntarily filed for protection from its creditors under chapter 11 of the United States Bankruptcy Code. Some six months later the Bank sued Coleman and Powell on their guaranties and moved in the bankruptcy court to foreclose its lien on the property securing the note. However, the Bank itself soon became insolvent, and on October 14, 1983, was taken over by the Federal Deposit Insurance Corporation, which thus succeeded to the Bank's rights in Judico's note and the security and guaranties, and the Bank's position in its lawsuit against Coleman and Powell.

In November 1983, Coleman and Powell's attorney sent a letter to the FDIC, stating in substance:

I represent the defendants in the above-styled and numbered cause. I would be appreciative if we could set a meeting regarding settlement of the lawsuit.

The action is predicated on a real estate note to [sic] a corporation, Judico Enterprises, Inc., in which the defendants were principals. The defendants personally guaranteed the note. The corporation is presently in Chapter 11 bankruptcy proceedings and still holds title to the property. The property is worth approximately the amount of the balance due on the note. My clients would like to meet with you regarding abandonment of the realty to the bank, so that a sale of the property would be possible by the bank. Please advise if you would be available to meet with my clients and myself in the near future.

The record does not reflect whether the requested meeting ever occurred, or whether Coleman and Powell took any other steps to sell the property or to cause Judico to sell the property.

On August 15, 1984, the FDIC obtained an agreed order from the bankruptcy court allowing it to foreclose on the property securing the note. The FDIC sold the property on June 7, 1985, for $357,000, leaving a balance due slightly in excess of $486,000.

The FDIC then moved for summary judgment against Coleman and Powell for the deficiency. The guarantors responded that the FDIC was not entitled to summary judgment because it had a duty to act in good faith and to pursue and protect collateral, and a factual dispute remained over whether it breached that duty. Specifically, Coleman and Powell complained that the FDIC delayed foreclosure and sale of the property during a time when it knew that the market value of the property was declining, thus increasing their liability on their guarantees. The guarantors did not allege any irregularities in the sale of the property, or that the price bid was inadequate. After hearing, the trial court granted the FDIC's motion and rendered judgment against the guarantors.[1] The court of appeals reversed and remanded for trial, holding that "the duty of good faith obtained in this case, and that whether or not [the FDIC] breached that duty by undue delay in foreclosing, is a material question of fact left to be determined." 762 S.W.2d 243, 245.

## II

Coleman and Powell contend that a secured creditor owes a guarantor of the indebtedness a duty of good faith which requires the creditor to liquidate its security promptly after default by the debtor to minimize the guarantor's liability for any deficiency. This duty, Coleman and Powell argue, derives from three sources. We examine each in turn.

■ First, Coleman and Powell contend that the FDIC had a duty of good faith under section 1.203 of the Texas Uniform Commercial Code, which states: "Every contract or duty within this title imposes an obligation of good faith in its performance or enforcement." TEX.BUS. & COM.CODE ANN. § 1.203 (Vernon 1968). Coleman and Powell argue that this section imposed upon the FDIC a duty of good faith in exercising its rights under the guaranties. It is not at all clear that a guarantee agreement contained in a separate document, guaranteeing payment of a promissory note secured by a lien on real property, is a contract within the UCC to which section 1.203 applies. See Crown Life Ins. Co. v. LaBonte, 111 Wis.2d 26, 330 N.W.2d 201, 207–209 (1983); see also Simpson v. MBank Dallas, 724 S.W.2d 102, 105–106 (Tex.App.—Dallas 1987, writ ref'd n.r.e.); FDIC v. Attayi, 745 S.W.2d 939, 948 (Tex. App.—Houston [1st Dist.] 1988, no writ). Assuming, however, that section 1.203 does apply to the guaranties in this case, it does not support Coleman and Powell's contention. The UCC defines "good faith" as "honesty in fact". TEX.BUS. & COM.CODE ANN. § 1.201(19) (Vernon 1968). "The test is not diligence or negligence...." Riley v. First State Bank, 469 S.W.2d 812, 816 (Tex.Civ.App.—Amarillo 1971, writ ref'd n.r.e.); The Richardson Co. v. First Nat'l Bank, 504 S.W.2d 812, 816 (Tex.Civ.App.— Tyler 1974, writ ref'd n.r.e.); First State Bank & Trust Co. v. George, 519 S.W.2d 198, 203 (Tex.Civ.App.—Corpus Christi 1974, writ ref'd n.r.e.). The guarantors' complaint in this case is not that the FDIC was dishonest, but that it was not diligent. The UCC does not require diligence for good faith.

■ Second, Coleman and Powell argue that the FDIC had a duty of good faith under state common law, citing this Court's decisions in Aranda v. Ins. Co. of N. Am., 748 S.W.2d 210 (Tex.1988), Arnold v. National County Mut. Fire Ins. Co., 725 S.W.2d 165 (Tex.1987), and Manges v. Guerra, 673 S.W.2d 180 (Tex.1984). The Court has consistently held, however, that a duty of good faith is not imposed in every contract but only in special relationships marked by shared trust or an imbalance in

---

1. The record does not reflect why the trial court rendered judgment against the guarantors for only $450,475.42, an amount less than the deficiency established by the FDIC's summary judgment evidence. The record does reflect that the FDIC nonsuited its claim for attorney fees.

bargaining power. *Aranda,* 748 S.W.2d at 212; *Arnold,* 725 S.W.2d at 167; *Manges,* 673 S.W.2d at 183; *see English v. Fischer,* 660 S.W.2d 521, 524–525 (Tex.1983) (Spears, J., concurring). The relationship of mortgagor and mortgagee ordinarily does not involve a duty of good faith. *See English,* 660 S.W.2d at 522; *Lovell v. Western Nat'l Life Ins. Co.,* 754 S.W.2d 298, 302–303 (Tex.App.—Amarillo 1988, writ denied). Similarly, the relationship between a creditor and guarantor does not ordinarily import a duty of good faith. *Cf. Rodgers v. Tecumseh Bank,* 756 P.2d 1223 (Okla.1988) (no duty of good faith and fair dealing between lender and borrower). In this case, Coleman and Powell do not even assert a special relationship with the holders of their guaranties that would give rise to the duty of good faith and fair dealing that this Court has recognized in other contexts.

Third, Coleman and Powell argue that the FDIC had a duty of good faith under the federal common law, citing *Frederick v. United States,* 386 F.2d 481 (5th Cir. 1967). The issue in *Frederick,* however, was whether the creditor sold the collateral for an inadequate price—$44,100 instead of $299,000. The court held that the creditor, having undertaken to sell the property, was required to conduct the sale fairly. The guarantors in the case before us do not complain of the FDIC's conduct of the sale of the property securing Judico's debt. They complain only that the FDIC did not sell it soon enough. The FDIC had no federal common law duty to foreclose its lien expeditiously. To the contrary, *Frederick* states: "The guarantor cannot compel the creditor to go against the security (and the guaranty so states)...." 386 F.2d at 486.

### III

Apart from the lack of authority for Coleman and Powell's contention that a creditor must use good faith in deciding whether and when to foreclose a lien on real property so as to minimize the liability of guarantors of the secured debt, there are other reasons for not imposing a duty of good faith in this case.

To begin with, Coleman and Powell were fully able to protect themselves from any increased liability resulting from a decline in the market value of the property securing Judico's debt, and they should not be permitted to require that the Bank and FDIC look out for their interests. Coleman and Powell were controlling principals of the debtor, Judico. They negotiated the note and guaranties, and later caused Judico to seek protection from all its creditors, including the Bank. If the value of the property really approximated the debt against it, as their counsel claimed,[2] they should have caused Judico to sell it. They might have bought it themselves if they were able, paid the debt, and kept any profit. Coleman and Powell have not explained why the Bank and FDIC should have been any more anxious to sell the property than they were. Even if they had not been able to cause Judico to sell the property, they were entitled to pay off its debt to the FDIC and be subrogated to the FDIC's rights against Judico and in the secured property. *See Crimmins v. Lowry,* 691 S.W.2d 582, 585 (Tex.1985).

2. Actually, the record reflects that at no time after Judico's default did the value of the property ever exceed the debt against it. The record contains the following property valuations and note balance figures (principal and interest exclusive of taxes and other expenses which also accrued over time):

| Date | Appraised Value | Principal & Interest |
| --- | --- | --- |
| 08/08/83 | | $576,059.27 |
| 03/30/84 | $550,000.00 | |
| 04/05/84 | | $618,503.31 |
| 05/01/84 | $568,000.00 | |
| 05/08/84 | | $624,780.90 |
| 01/15/85 | | $673,989.51 |
| 01/28/85 | $450,000.00 | |
| 03/06/85 | $390,000.00 | |
| 05/20/85 | | $695,024.51 |

Coleman and Powell's estimation that the value of the security approximated the debt was rather optimistic.

Furthermore, to impose a duty of good faith on a creditor in these circumstances is an impossible burden. Coleman and Powell complain that the Bank and the FDIC should not have waited to sell the property in a declining market. The record reflects, however, that they actually benefited from the delay in foreclosure from March till May of 1984. See note 2, *supra*. If a creditor were obliged to hasten to liquidate security in a declining market, logically it would also be required to wait to liquidate security in a climbing market. The FDIC assumed no such obligation under the guaranties in this case, and none should be imposed by law. It is difficult enough to determine when it is best to foreclose to protect one's own interests; it is virtually impossible to know when it is best to protect others' interests.

■ Even if the FDIC had had a duty of good faith in these circumstances, Coleman and Powell waived it. As set out above, the guaranties expressly relieved the creditor from seeking to satisfy its debt from the collateral at all. The guaranties gave the FDIC the right to ignore the collateral and obtain a judgment against Coleman and Powell for the full amount of the debt, even if the collateral might have been sold to satisfy part of that debt. That right to decide whether to liquidate the collateral necessarily included the right to decide when to do it.

Finally, if a creditor had a duty to the guarantors, and presumably the same duty to the debtor itself, to liquidate collateral only in such a way as to minimize a deficiency on the debt, the proper discharge of that duty would almost always raise material issues of fact. Like every other such duty, this obligation of good faith could be defined and applied as a matter of law only in a very few clear cases; in every other case the parameters of the duty could be determined only by a jury or other finder of fact. Deficiency suits could rarely be resolved by summary judgment, and would necessitate a full trial on the merits. Commercial transactions require more predictability and certainty than this rule would afford.

## IV

■ One further contention of Coleman and Powell remains. They contend that they are discharged from liability under section 3.606 of the UCC because the FDIC unjustifiably impaired the collateral for Judico's debt. Section 3.606, however, discharges only a "party to the instrument" who does not consent to impairment of collateral. "Instrument" means a negotiable instrument. TEX.BUS. & COM.CODE ANN. § 3.102 (VERNON 1968). Coleman's and Powell's guaranties were not negotiable instruments, and they were not parties to Judico's note. Furthermore, Coleman and Powell expressly consented in their guaranties to the creditor's complete discretion in exercising its rights in the collateral. Accordingly, whatever protection section 3.606 affords does not extend to Coleman and Powell.

## V

We conclude that the summary judgment for the FDIC was proper. We therefore reverse the judgment of the court of appeals and affirm the judgment of the district court.

Dissenting opinion by MAUZY, J., joined by SPEARS and RAY, JJ.

DOGGETT, J., not sitting.

MAUZY, Justice, dissenting.

I respectfully dissent. I believe a duty of commercial reasonableness obtained in this case, and that whether FDIC breached that duty by undue delay in foreclosing is a question of fact for a jury to decide.

The majority states that "[t]he principal issue ... is whether, under the circumstances of this case, a secured creditor's failure to foreclose its lien promptly ... is a breach of any duty of good faith or fair dealing." 795 S.W.2d at 707. With all due respect, that is *not* the true issue presented in this case. A careful reading of the

record shows that Coleman and Powell pled and argued this case on a theory of "commercial reasonableness", *see Frederick v. United States,* 386 F.2d 481 (5th Cir.1967); *Mack Financial Corp. v. Scott,* 100 Idaho 889, 606 P.2d 993 (1980), not on a theory of good faith and fair dealing of the type recognized in *Aranda v. Insurance Co. of N. Amer.,* 748 S.W.2d 210 (Tex.1988), *Arnold v. Nat. County Mut. Fire Ins. Co.,* 725 S.W.2d 165 (Tex.1987), and *Manges v. Guerra,* 673 S.W.2d 180 (Tex.1984). Coleman and Powell argued before the trial court that FDIC was under a duty "to dispose of all collateral ... in a commercially reasonable manner," and that FDIC breached that duty because it was intentionally or negligently dilatory in liquidating the collateral. Coleman and Powell then presented sufficient summary judgment proof to put the issue before a jury. As explained by the court of appeals:

> There is sufficient unimpeached summary judgment evidence in the record before us in support of [respondents'] theory to reach a jury. In response to interrogatories, [FDIC's] answers *demonstrate an awareness, over time, that the fair market value of the real estate collateral in issue was declining.* In response to Interrogatory Sixteen, [FDIC] replied that the appraisers' values on the dates indicated, were as follows:

| | | |
|---|---|---|
| 03/30/84 | Clyde Lytle | $550,000.00 |
| 05/01/84 | Croissen Dannis, Inc. | $568,000.00 |
| 01/28/85 | American Appraisal Associates | $450,000.00 |
| 03/06/85 | Bob Jones & Co. | $390,000.00 |

Then, too, in the same set of interrogatories, *it was admitted that the FDIC's Commercial and Other Loan Credit Manual prescribes a four-month delinquency on a loan as appropriate for foreclosure, absent unusual circumstances.* [FDIC] argues that the property was subject to the stay of bankruptcy. *But when [FDIC] did renew efforts for relief from stay, its effort resulted in an agreed order a month later on August 15, 1984. From its pleadings, it appears FDIC took charge on October 4, 1983. The property was not sold until June 7, 1985.*

[Respondents] also point to [their] letter of November 16, 1983, to [FDIC], urging some action be taken and reciting as of that time, "[t]he property is worth approximately the amount of the balance due on the note." Bob Hurt, an account officer of [FDIC] who had "worked that asset" while assigned to Midland, testified on cross by deposition that he was "cognizant of declining property prices in the surrounding geographic area." Assuming the existence of a duty of [commercial reasonableness], from our review of [respondents'] summary judgment proof, we believe that a material issue of fact bearing on that issue was present. 762 S.W.2d at 244 (emphasis added).

The guaranty contract in question expressly stated that "[t]he creditor shall not be required to pursue any other remedies before invoking the benefits of this guaranty; especially it shall not be required to exhaust its remedies against endorsers, collateral and other security." Plainly, then, FDIC was not *required* to proceed against the collateral in question before invoking the guaranty agreement. Nevertheless, on August 15, 1984, *by an agreed order,* FDIC undertook to proceed *immediately* against the collateral. In that undertaking, I would hold, FDIC was obligated to act in a commercially reasonable manner. "If the creditor undertakes to do that which he need not do, since what he does must affect the surety, it is reasonable to hold that the surety is discharged to the extent of whatever loss results from the creditor's failure to use ordinary diligence." L. Simpson, *Law of Suretyship* § 75 at 382–383 (1950).

Finally, the majority argues that "Coleman and Powell were fully able to protect themselves from any increased liability resulting from a decline in the market value

of the property securing Judico's debt." 795 S.W.2d at 709. This is a legitimate subject of inquiry for FDIC to pursue, and for a jury to consider in determining whether FDIC acted in a commercially reasonable manner.

For these reasons, I would affirm the judgment of the court of appeals and remand the cause to the trial court so that a jury may decide the disputed issues of fact.

SPEARS and RAY, JJ., join in this dissenting opinion.