**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| BRANCH BANKING AND TRUST COMPANY, as successor in interest on behalf of Colonial Bank, N.A., *Plaintiff-Appellee*, <br><br> v. <br><br> D.M.S.I., LLC; NOAM SCHWARTZ; NST HOLDING, INC., Trustee; YOEL INY, Individually and as Trustee on behalf of Y & T Iny Family Trust, *Defendants-Appellants.* | No. 15-16933 <br><br> D.C. No. 2:11-cv-01778 APG-VCF |

| | |
|---|---|
| BRANCH BANKING AND TRUST COMPANY, *Plaintiff-Appellee*, <br><br> v. <br><br> REGENA HOMES, LLC; YOEL INY; NOAM SCHWARTZ; Y & T INY FAMILY TRUST DATED JUNE 8, 1994; NOAM SCHWARTZ TRUST DATED AUGUST 19, 1999; D.M.S.I., LLC; GREAT AMERICAN CAPITAL, *Defendants-Appellants.* | No. 15-16934 <br><br> D.C. No. 2:12-cv-00451 APG-GWF |

BRANCH BANKING AND TRUST
COMPANY,

*Plaintiff-Appellee*,

v.

SMOKE RANCH DEVELOPMENT, LLC;
YOEL INY, an individual and as
Trustee on behalf of Y&T Iny
Family Trust dated June 8, 1994, as
amended; NOAM SCHWARTZ,
individually and as Trustee on behalf
of Noam Schwartz Trust Dated
August 19, 1999; D.M.S.I., LLC,

*Defendants-Appellants*.

No. 15-16935

D.C. No.
2:12-cv-00453
APG-NJK

OPINION

Appeals from the United States District Court
for the District of Nevada
Andrew P. Gordon, District Judge, Presiding

Argued and Submitted April 21, 2017
San Francisco, California

Filed September 11, 2017

Before: A. Wallace Tashima and Richard A. Paez, Circuit
Judges, Carol Bagley Amon,[*] District Judge.

Opinion by Judge Tashima

---

[*] The Honorable Carol Bagley Amon, United States District Judge for
the Eastern District of New York, sitting by designation.

# SUMMARY**

### Standing / Preemption / Loans

The panel affirmed the district court's judgments in three actions against defendant debtors who failed to repay loans held by Branch Banking and Trust Company, arising from loans secured by real property in Nevada.

The panel rejected defendants' contention that Branch Banking lacked standing to bring the instant actions because it did not have the right to enforce the loans at the time it filed its complaints.  The panel also held that Branch Banking was not barred by issue preclusion under Nevada law.

The panel held that Nev. Rev. Stat. § 40.459(1)(c) – which limited the ability of a third party to profit by purchasing real estate debt at a discount and foreclosing at full price – was preempted by federal law, the Financial Institutions Reform, Recovery, and Enforcement Act of 1989, as applied to transferees of the Federal Deposit Insurance Corporation ("FDIC").  The panel noted that it would be more difficult for the FDIC to dispose of the assets of failed banks if transferees, such as Branch Banking, could not turn a profit on those assets. The panel rejected defendants' claim that Branch Banking had failed to prove each element of its deficiency action.

The panel rejected the affirmative defenses under Nevada law asserted by defendants based on alleged work-out

---

** This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

agreements with Branch Banking. Specifically, the panel rejected defendants' argument that the alleged work-out agreements constituted contracts with implied covenants of good faith and fair dealing because under Nevada law, the agreements did not constitute contracts. The panel also held that all the elements of promissory estoppel were not met. The panel further held that no oral work-out agreement could have modified the loans or operated to waive Branch Banking's rights. The panel held that the defendants did not identify any circumstances that made the application of laches appropriate. Finally, the panel held that Branch Banking owed no duty to mitigate defendants' deficiency by the timing of the foreclosure proceedings.

The panel held that the district court did not abuse its discretion in denying defendants' late-filed motion to amend pleadings because defendants demonstrated neither good cause nor excusable neglect.

The panel held that defendants were not entitled to a jury trial on the fair market value of the property. The panel also held that Branch Banking did not violate Nev. Rev. Stat. § 163.120(2) concerning notice to trust beneficiaries.

---

### COUNSEL

Bart K. Larsen (argued), Kolesar & Leatham, Las Vegas, Nevada, for Defendants-Appellants.

Jeremy Nork (argued), Holland & Hart LLP, Las Vegas, Nevada, for Plaintiff-Appellee.

---

**OPINION**

TASHIMA, Circuit Judge:

Defendants in these three actions are debtors who have failed to repay loans held by Branch Banking and Trust Company ("BB&T"). They appeal the respective judgments of the district court against them. We have jurisdiction under 28 U.S.C. § 1291 and we affirm.

## I. BACKGROUND

### A. The *D.M.S.I.* Action, No. 15-16933

On February 27, 2004, D.M.S.I., LLC, Yoel Iny, and Noam Schwartz executed and delivered a Promissory Note to Colonial Bank, N.A., for $2,000,000 ("D.M.S.I. Loan"). On the same date, Yoel Iny, acting as Trustee of the Y & T Iny Family Trust, and Ronnie Schwartz, as a Trustee of the NS 1998 Family Trust, executed and delivered guarantees of the payment of the D.M.S.I. Loan. The D.M.S.I. Promissory Note was amended in 2006, increasing the principal amount of the loan to $3,500,000. After an additional amendment in March 2009, the D.M.S.I. Loan was set to be paid in full by June 1, 2009. It is undisputed that Defendants failed to repay the D.M.S.I. Loan.

Colonial Bank, N.A., was succeeded by Colonial Bank, an Alabama banking corporation. On August 14, 2009, Colonial Bank was closed, and the Federal Deposit Insurance Corporation ("FDIC") was named as its receiver.

On the same day, the FDIC executed an agreement titled "Purchase and Assumption Agreement Whole Bank All

Deposits Among Federal Deposit Insurance Corporation, Receiver of Colonial Bank, Montgomery, Alabama Federal Deposit Insurance Corporation and Branch Banking and Trust Company Winston-Salem, North Carolina" ("PAA"). The PAA assigns "all right, title, and interest of the Receiver in and to all of the assets . . . of the Failed Bank [Colonial Bank]" to BB&T. The PAA goes on to state that "Schedules 3.1 and 3.1a attached hereto and incorporated herein sets forth certain categories of Assets purchased hereunder. Such schedule is based upon the best information available to the Receiver and may be adjusted as provided in Article VIII." Schedules 3.1 and 3.1a to the PAA are both blank, containing only the legend "SEE ATTACHED LIST." No "attached list" was included with the PAA.

At the same time it entered the PAA, BB&T also entered a loss sharing agreement with the FDIC "for reimbursement of loss sharing expenses on certain loans and other assets." The loss sharing agreement applies "when the Assuming Bank [BB&T] purchases Shared-Loss Assets." Schedule 4.15b lists the assets subject to the loss sharing agreement. The D.M.S.I. Loan is listed in Schedule 4.15b.

On October 23, 2009, the FDIC executed an "Assignment of Security Instruments and Other Loan Documents" ("Bulk Assignment"). The Bulk Assignment assigns to BB&T

> all of Assignor's [FDIC's] rights, title and interests in and to all those certain Mortgages, Security Deeds, Deeds to Secure Debt, Deeds of Trust, Assignments of Rents and Leases, UCC-1 financing statements, judgment liens, and all such other instruments and security agreements securing loans owned by Colonial

> Bank . . . and all modifications, extensions, amendments and renewals thereto (collectively the "Security Instruments").

The Bulk Assignment also assigns "all of Assignor's [FDIC's] rights, title and interests in and to the promissory notes, loan documents and all other Indebtedness secured by the Security Instruments." The Bulk Assignment thus appears to apply only to security instruments and to secured debt.

The FDIC also produced an undated allonge[1] purporting to endorse the D.M.S.I. Loan to BB&T effective August 14, 2009.

In 2009 and 2010, BB&T engaged in discussions with Defendants about restructuring the D.M.S.I. Loan. Notwithstanding discussions over this "work-out agreement," on August 18, 2010, Defendants signed an "Acknowledgment" stating that any such discussions "are without any prejudice to the Lender [BB&T] in the exercise of its rights and remedies with respect to the Loans. Furthermore, Lender reserves the right in its sole discretion to terminate discussions at any time and thereafter exercise its right and remedies."

On November 4, 2011, BB&T filed the *D.M.S.I.* Action against Defendants. The district court issued a Discovery

---

[1] An "allonge" is a "slip of paper sometimes attached to a negotiable instrument for the purpose of receiving further [e]ndorsements when the original paper is filled with [e]ndorsements." *Edelstein v. Bank of N.Y. Mellon*, 286 P.3d 249, 252 n.2 (Nev. 2012) (alterations in original) (quoting Black's Law Dictionary 1859 (9th ed. 2009)).

Plan and Scheduling Order on May 2, 2012. The Scheduling Order established November 2, 2012, as the deadline to file motions to amend the pleadings. The operative Second Amended Complaint was filed on June 29, 2012. It alleges breach of promissory note, breach of guaranty, and breach of the covenant of good faith and fair dealing. Defendants filed their answers to the Second Amended Complaint in July 2012. On January 14, 2013, Defendants moved to extend the deadline to amend their pleadings, which BB&T did not oppose and which the district court granted. On March 6, 2013, Defendants filed amended answers. On March 13, 2013, five days before the close of discovery and well after the deadline to amend had passed, Defendants filed a second motion to again extend the deadline to amend their pleadings for the purpose of adding several new defenses and a counterclaim against BB&T. This motion was denied.

After the close of discovery, the parties filed cross-motions for summary judgment. The district court granted BB&T's motion and denied Defendants' motion. The district court's order does not address the affirmative defenses raised by Defendants regarding the alleged work-out agreement. On August 27, 2015, the district court entered judgment against Defendants for $7,171,197.99. Defendants timely appealed.

## B. The *Regena* Action, No. 15-16934

On September 7, 2005, Regena Homes, LLC, executed and delivered a promissory note secured by a deed of trust to Colonial Bank, N.A., in the amount of $3,377,000 ("Regena Loan"). The Regena Loan was secured by a deed of trust for real property in Clark County, Nevada ("Regena Property"). On the same date the Regena Loan was executed, Yoel Iny as an individual and as a Trustee of the Y & T Iny Family Trust,

Noam Schwartz as an individual and as a Trustee of the Noam Schwartz Trust, D.M.S.I., LLC, and Great American Capital executed and delivered guarantees of the payment of the Regena Loan. After subsequent amendments, the Regena Loan was due to be paid in full by December 8, 2009. It is undisputed that Defendants failed to repay the Regena Loan.

Colonial Bank, N.A., was succeeded by Colonial Bank, which subsequently failed and went into receivership. The FDIC, as receiver, executed the PAA and loss sharing agreement described above. The Regena Loan is listed on Schedule 4.15b to the loss sharing agreement. The Bulk Assignment is as described above. Finally, the FDIC produced an undated allonge purporting to endorse the Regena Loan to BB&T, effective August 14, 2009.

Just as with the D.M.S.I. Loan, BB&T engaged in discussions with Defendants about a work-out agreement regarding the Regena Loan. Defendants executed an Acknowledgment preserving BB&T's rights and remedies. BB&T had the Regena Property assessed each year from 2009 to 2011. These assessments revealed that the value of the Regena Property was rapidly declining.

On February 29, 2012, the Regena Property was sold at a non-judicial trustee's sale to partially satisfy the Regena Loan. BB&T filed the *Regena* Action against Defendants on March 16, 2012. On June 8, 2012, BB&T filed the operative Amended Complaint, alleging breach of guaranty, breach of the implied covenant of good faith and fair dealing, and for a deficiency judgment.

After discovery, the parties filed cross-motions for summary judgment. The district court denied Defendants'

motion and granted summary judgment to BB&T as to liability. The only remaining issue was the amount of the deficiency owed to BB&T. Defendants requested a jury to hear all issues relating to the deficiency. After briefing, the district court ruled that the fair market value of the Regena Property should be determined by the court, and the remaining issues would be left for the jury. The district court subsequently granted BB&T's motion *in limine* excluding all evidence of the alleged work-out agreement.

The parties stipulated to the sale price of the Regena Property. On April 13, 2015, a jury determined that the amount of debt on the Regena Loan on the date of the trustee's sale was $2,069,845.78. On May 11, 2015, the parties stipulated to the fair market value of the Regena Property on the date of the trustee's sale. The district court then entered judgment against Defendants for $1,975,766.24. Defendants timely appealed.

## C. The *Smoke Ranch* Action, No. 15-16935

On September 26, 2005, Smoke Ranch Development, LLC, executed and delivered a promissory note in the amount of $800,000 to Colonial Bank, N.A. ("Smoke Ranch Loan"). The promissory note was secured by a Deed of Trust for certain real property in Clark County, Nevada ("Smoke Ranch Property"). On the same date, Yoel Iny, both as an individual and as Trustee of the Y & T Iny Family Trust, Noam Schwartz, as an individual and as a Trustee of the Noam Schwartz Trust, and D.M.S.I., LLC, executed a guarantee of the payment of the Smoke Ranch Loan. After subsequent amendments, the Smoke Ranch Loan was due to be paid in full by April 1, 2010. It is undisputed that Defendants failed to repay the Smoke Ranch Loan.

Colonial Bank, N.A., was succeeded by Colonial Bank, which subsequently failed and went into receivership. The FDIC, as receiver, executed the PAA and loss sharing agreement, which are described above. The Smoke Ranch Loan is listed on Schedule 4.15b to the loss sharing agreement. The Bulk Assignment is as described above. Finally, the FDIC produced an undated allonge purporting to endorse the Smoke Ranch Loan to BB&T, effective August 14, 2009.

Just as with the D.M.S.I. and Regena Loans, BB&T engaged in discussions with Defendants about a work-out agreement regarding the Smoke Ranch Loan. Defendants executed an Acknowledgment preserving BB&T's rights and remedies. BB&T had the Smoke Ranch Property assessed twice, in 2009 and 2010. These assessments revealed that the value of the Regena Property was rapidly declining.

On February 29, 2012, the Smoke Ranch Property was sold at a non-judicial trustee's sale to partially satisfy the Smoke Ranch Loan. On March 16, 2012, BB&T filed the *Smoke Ranch* Action against Defendants. The operative Amended Complaint was filed on June 8, 2012. It alleges claims for breach of guaranty, breach of the implied covenant of good faith and fair dealing, and for a deficiency judgment.

After discovery, the parties filed cross-motions for summary judgment. On September 26, 2014, the district court entered summary judgment for BB&T on liability and denied Defendants' motions for summary judgment.

The only issue left was a determination of the amount of the deficiency. Just as in the *Regena* Action, Defendants requested a jury trial on all elements of this issue, but the

district court determined that the fair market value of the Smoke Ranch Property would be determined by the court. The fair market value of the Smoke Ranch Property was determined at an evidentiary hearing. The parties stipulated to the sale price of the Smoke Ranch Property at the trustee's sale.

Prior to trial, the district court granted BB&T's motion *in limine* to exclude all evidence of the alleged work-out agreement.

On June 8, 2015, the parties agreed to stipulate to the amount of the debt remaining on the Smoke Ranch Loan. This obviated the need for a jury trial. After the relevant stipulations were made, the district court entered judgment against Defendants for $630,401.15. Defendants timely appealed.

## II. STANDARDS OF REVIEW

We review the district court's grant of summary judgment *de novo*. *Kraus v. Presidio Tr. Facilities Div./Residential Mgt. Branch*, 572 F.3d 1039, 1042 (9th Cir. 2009). Our review of denials of summary judgment is also *de novo*. *Brewster v. Shasta Cty.*, 275 F.3d 803, 806 (9th Cir. 2001).

Constitutional questions are reviewed *de novo*. *Servin-Espinoza v. Ashcroft*, 309 F.3d 1193, 1196 (9th Cir. 2002). This includes the question of whether there is a right to a jury trial under the Seventh Amendment. *Kulas v. Flores*, 255 F.3d 780, 783 (9th Cir. 2001).

Ordinarily, rulings on motions *in limine* are reviewed for an abuse of discretion. *Masson v. New Yorker Magazine,*

*Inc.*, 85 F.3d 1394, 1399 (9th Cir. 1996). However, when a ruling on a motion *in limine* is used to "preclude[] presentation of a defense," we review the ruling *de novo*. *United States v. Ross*, 206 F.3d 896, 898–99 (9th Cir. 2000).

Denial of a motion to amend pleadings is reviewed for an abuse of discretion. *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 607 (9th Cir. 1992).

## III.  STANDING

Defendants argue that BB&T lacked standing to bring the instant actions because it did not have the right to enforce the loans at the time it filed its complaints. We disagree.

### A.  The Bulk Assignment

The Bulk Assignment transferred to BB&T all security instruments previously owned by Colonial Bank, as well as all loans and promissory notes secured by those instruments. The Regena and Smoke Ranch Loans were secured, and they therefore fall within the scope of the Bulk Assignment.

Citing Nevada's statute of frauds, Nev. Rev. Stat. § 111.205(1), Defendants contend that the Bulk Assignment is invalid because it does not describe the property securing the loans with particularity. However, there can be no debate that the Regena and Smoke Ranch properties are adequately described in their respective Deeds of Trust, which are referenced in the Loan Documents. There is thus no merit to Defendants' contention that the Bulk Assignment does not describe the property with particularity.

## B.  The PAA

Section 3.1 of the PAA transferred to BB&T "all right, title, and interest of the Receiver [FDIC] in and to all of the assets . . . of the Failed Bank."  On its face, all three loans are encompassed by this language.  Section 3.1 goes on to state that "Schedules 3.1 and 3.1a attached hereto and incorporated herein sets forth certain categories of Assets purchased hereunder."  The attached schedules are blank.

However, there is other evidence that the parties to the PAA intended to transfer the three loans at issue.  At the same time that they entered into the PAA, the FDIC and BB&T entered into a loss sharing agreement to "reimburs[e ] loss sharing expenses on certain loans and other assets . . . when the Assuming Bank purchases" such assets.  The loss sharing agreement therefore applies to "loans and other assets" that were transferred to BB&T.  The loss sharing agreement lists the assets to which it applies in Schedule 4.15b.  All three loans at issue were listed on this schedule.  It is therefore apparent that the parties intended for the PAA to transfer all three loans, even if the loans were never listed in the correct schedule.

All three loans were therefore transferred by the PAA.

## C.  Issue Preclusion

Under Nevada law, issue preclusion requires four elements:

> "(1) the issue decided in the prior litigation
> must be identical to the issue presented in the
> current action; (2) the initial ruling must have

been on the merits and have become final; . . .
(3) the party against whom the judgment is
asserted must have been a party or in privity
with a party to the prior litigation;" and (4) the
issue was actually and necessarily litigated.

*Five Star Capital Corp. v. Ruby*, 194 P.3d 709, 713 (Nev. 2008) (footnote omitted) (quoting *Univ. of Nev. v. Tarkanian*, 879 P.2d 1180, 1191 (Nev. 1994)).

In 2013, the Nevada Supreme Court affirmed a lower court ruling that BB&T could not rely on the PAA to show assignment of a loan. *R & S St. Rose Lenders, LLC v. Branch Banking & Tr. Co.*, No. 56640, 2013 WL 3357064, *3 (Nev. May 31, 2013) (affirming *Murdock v. Rad*, No. 08A574852, 2010 WL 9564700 (Nev. Dist. Ct. June 18, 2010)). The loan at issue in *R & S* and *Murdock* was not one of the loans at issue in the instant cases. Further, the *R & S* and *Murdock* courts' reasoning was not that BB&T lacked standing, but rather that it had failed to produce schedules to the PAA listing assets excluded from the transfer. There was thus no evidence that the loan at issue there was not excluded from the PAA by one of those schedules. *See R & S*, 2013 WL 3357064, at *3.

The issue in *R & S* and *Murdock* was not "identical" to the issue in the instant cases. Those previous cases dealt with a different loan and a different evidentiary record. In the instant cases, BB&T has produced not only the PAA, but also the attendant schedules showing that the loans at issue were not excluded from the terms of the PAA. As the district court noted, "BB&T may have learned its evidentiary lesson from *Murdock*." *Branch Banking & Tr. Co. v. D.M.S.I. L.L.C.*, No. 2:11-cv-01778-APG-VCF, 2014 WL 4840770, at *6 (D. Nev.

Sept. 26, 2014). BB&T is therefore not issue-precluded from relying on the PAA to show that the loans were transferred to it.

Defendants also argue that BB&T is issue-precluded from relying on the Bulk Assignment because that agreement was excluded from evidence in the *Murdock* case. This argument lacks merit. The Bulk Assignment was excluded in *Murdock*, not because of any deficiency in the document itself, but because it was not timely disclosed by BB&T. *R & S*, 2013 WL 3357064, at *3. The validity of the Bulk Assignment was never litigated in the state court, and BB&T is therefore not issue-precluded from relying on it.

## IV. FEDERAL PREEMPTION

In the *Regena* and *Smoke Ranch* Actions, BB&T brought claims for deficiency. At the time this action was brought, Nev. Rev. Stat. § 40.459(1)(c) (repealed May 25, 2015) ("Subsection (1)(c)") provided that the court in a deficiency action

> shall not render judgment for more than: . . . the amount by which the amount of the consideration paid for that right exceeds the fair market value of the property sold at the time of sale or the amount for which the property was actually sold, whichever is greater . . . .

There is no dispute that BB&T has not shown the consideration that it paid for the Regena and Smoke Ranch Loans. Defendants argue that BB&T has therefore failed to prove each element of its deficiency action. BB&T counters

that Subsection (1)(c) is unconstitutional as applied in these cases under the Supremacy Clause and the Contracts Clause of the U.S. Constitution.  We hold that Subsection (1)(c) is preempted by federal law.**[2]**

Prior to 2011, Nev. Rev. Stat. § 40.459 limited the amount recoverable in a deficiency action to the lesser of (1) the difference between the amount of the debt and the fair market value of the property at the time of sale; or (2) the difference between the amount of the debt and the actual sale price of the property.  Nev. Rev. Stat. § 40.459(1)–(2) (1993).  In 2011, § 40.459 was amended to add Subsection (1)(c). 2011 Nev. Stat. ch. 311 § 5 at 1743.   The purpose of Subsection (1)(c) was to "reduce foreclosures in favor of alternatives by eliminating the ability of a third party to profit by purchasing real estate debt at a discount and foreclosing at full price." *Eagle SPE NV I, Inc. v. Kiley Ranch Cmtys.*, 5 F. Supp. 3d 1238, 1246 (D. Nev. 2014).

The Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA") is one of the statutes that govern the FDIC. *See* Pub. L. 101-73, 103 Stat. 183, codified as amended in various sections of Title 12, U.S.C. The underlying purpose of FIRREA as a whole is "to enable the federal government to respond swiftly and effectively to the declining financial condition of the nation's banks and savings institutions." *Henderson v. Bank of New Eng.*, 986 F.2d 319, 320 (9th Cir. 1993).

In *Munoz v. Branch Banking & Tr. Co.*, 348 P.3d 689 (Nev. 2015), the Nevada Supreme Court held that Subsection

---

**[2]** Because we affirm on that basis, we do not address Defendants' Contracts Clause argument.

(1)(c) is preempted by FIRREA to the extent that it would limit recovery on loans transferred by the FDIC. *Id.* at 690. The court reasoned that applying Subsection (1)(c) to transferees of loans from the FDIC would frustrate the purpose of FIRREA by making it more difficult for the FDIC to dispose of the assets of failed banks. *Id.* State law is preempted when it "frustrates the purpose of the national legislation, or impairs the efficiencies of these agencies of the Federal government to discharge the duties for the performance of which they were created." *McClellan v. Chipman*, 164 U.S. 347, 357 (1896) (quoting *Davis v. Elmira Sav. Bank*, 162 U.S. 275, 283 (1896); *see also Malone v. White Motor Corp.*, 435 U.S. 497, 504 (1978) (observing that state and local laws that frustrate federal law are preempted).

The reasoning in *Munoz* is persuasive. It would be more difficult for the FDIC to dispose of the assets of failed banks if the transferee could not turn a profit on those assets. BB&T would likely never have accepted the Regena and Smoke Ranch Loans if it believed that Subsection (1)(c) would limit its ability to recover on those loans in a deficiency action. We adopt the reasoning of *Munoz* and hold that Subsection (1)(c) is preempted by federal law as applied to transferees of the FDIC.

## V. AFFIRMATIVE DEFENSES

In each of these three cases, Defendants assert affirmative defenses based on an alleged work-out agreement with BB&T. According to Defendants, BB&T promised Defendants "adequate time to implement a real estate property action plan regarding various loans it had" with Defendants in exchange for writing off or writing down the loans at issue. The district court did not err in granting

summary judgment to BB&T in spite of Defendants' defenses.

## A.  Breach of Covenant of Good Faith and Fair Dealing

Defendants argue that the alleged work-out agreements constituted contracts, and, as with all contracts, came with implied covenants of good faith and fair dealing. *Hilton Hotels Corp. v. Butch Lewis Prods., Inc.*, 862 P.2d 1207, 1209 (Nev. 1993).  Under Nevada law, this covenant is breached when "one party performs a contract in a manner that is unfaithful to the purpose of the contract and the justified expectations of the other party are thus denied." *Perry v. Jordan*, 900 P.2d 335, 338 (Nev. 1995) (quoting *Hilton Hotels Corp v. Butch Lewis Prods., Inc*., 808 P.2d 919, 913 (Nev. 1991).  Defendants contend that BB&T violated the covenant of good faith and fair dealing when it filed the instant actions without giving Defendants time to execute a work-out plan.

This defense fails because the alleged work-out agreements did not constitute contracts.  Rather, it appears that BB&T orally promised Defendants time to come up with a way to work out their debt.  Such a promise, with no consideration, is not a contract. *Pink v. Busch*, 691 P.2d 456, 459 (Nev. 1984).  Absent a contract, there can be no implied covenant of good faith and fair dealing.

Further, any oral work-out agreement between BB&T and Defendants would be void or unenforceable.  The Loan Documents specifically provide that they can only be modified by written agreement.  The alleged oral work-out agreements could not, therefore, have modified the Loan Documents or released Defendants from liability.

Defendants also entered into written Acknowledgments that any discussions regarding a work-out agreement would not prejudice BB&T with respect to its "rights and remedies." Defendants in each action were thus parties to the Loan Documents and the Acknowledgments, both of which made them aware that BB&T could collect on its loan, notwithstanding any oral discussions about a work-out.

## B. Estoppel

Estoppel can apply to a promise for which there was no consideration paid. In such a case, reliance is a substitute for consideration. *Id*. The elements of promissory estoppel are:

> (1) the party to be estopped must be apprised of the true facts; (2) he must intend that his conduct shall be acted upon, or must so act that the party asserting estoppel has the right to believe it was so intended; (3) the party asserting the estoppel must be ignorant of the true state of facts; (4) he must have relied to his detriment on the conduct of the party to be estopped.

*Id.* (quoting *Chequer, Inc. v. Painters & Decorators Joint Comm., Inc.*, 655 P.2d 996, 998–99 (Nev. 1982)). In this case, the third element is absent. Defendants were not ignorant that BB&T could commence a lawsuit to collect on the loans at any time. Defendants knew that 1) the Loan Documents could only be modified by written agreement, and 2) the Acknowledgments reserved BB&T's rights and remedies under the Loan Documents. They could not have reasonably believed that BB&T would give them infinite time

to put their affairs in order.  The defense of estoppel therefore fails.

## C.  Modification and Waiver

Defendants argue that the alleged oral work-out agreements modified the terms of their loans and that by entering the work-out agreement, BB&T waived its right to collect on the loan in a lawsuit.  However, as noted above, the Loan Documents could only be modified by written agreement.  No oral work-out agreement could have modified the loans or operated to waive BB&T's rights.

## D.  Laches

Defendants argue that BB&T is subject to the doctrine of laches because it waited too long before foreclosing on the Regena and Smoke Ranch Properties, thereby allowing the prices to drop with the market.  "Especially strong circumstances must exist . . . to sustain a defense of laches when the statute of limitations has not run."  *Bldg. & Constr. Trades Council of N. Nev. v. State ex rel. Pub. Works Bd.*, 836 P.2d 633, 637 (Nev. 1992) (citation omitted).  BB&T brought the *Regena* and *Smoke Ranch* Actions within the statute of limitations, and Defendants have not identified any circumstances that make the application of laches appropriate.

## E.  Failure to Mitigate Damages

In the *Regena* and *Smoke Ranch* Actions, Defendants asserted the defense of failure to mitigate damages.  The basis for this defense is that BB&T strung Defendants along with promises of a work-out agreement, all the while intending to

foreclose on the properties when the market bottomed out. However, Defendants have not cited any precedent showing that BB&T thereby breached a duty to them.

Although there is no Nevada case directly on point, in at least one other jurisdiction that has addressed the issue, the court held that there is no duty for a secured creditor to time a foreclosure sale so as to minimize a deficiency. *FDIC v. Coleman*, 795 S.W.2d 706, 709–710 (Tex. 1990). In *Coleman*, the Texas Supreme Court reasoned:

> If a creditor were obliged to hasten to liquidate security in a declining market, logically it would also be required to wait to liquidate security in a climbing market. The FDIC assumed no such obligation under the guaranties in this case, and none should be imposed by law. It is difficult enough to determine when it is best to foreclose to protect one's own interests; it is virtually impossible to know when it is best to protect others' interests.

*Id.* at 710. In addition, the court noted that the secured debtor always had the option to sell the property itself if it believed the market to be favorable, rather than waiting for the secured creditor to foreclose. *Id.* at 709.

We find the reasoning of the *Coleman* court persuasive. BB&T owed no duty to mitigate Defendants' deficiency by

the timing of its foreclosure proceedings; the mitigation of damages defense therefore fails.**[3]**

## VI.  LATE-FILED MOTION TO AMEND PLEADINGS

In the *D.M.S.I.* Action, after the deadline to amend had already passed, Defendants requested leave to again extend the deadline.  Defendants sought to amend their pleading to add four new defenses and a counterclaim based on the alleged work-out agreement.

Under Federal Rule of Civil Procedure 16, "[a] schedule may be modified only for good cause and with the judge's consent."  Fed. R. Civ. P. 16(b)(4).  "Once the district court had filed a pretrial scheduling order pursuant to Federal Rule of Civil Procedure 16 which established a timetable for amending pleadings that rule's standards controlled." *Johnson*, 975 F.2d at 607–08.  The good cause standard of Rule 16(b) "primarily considers the diligence of the party seeking the amendment."  *Id.* at 609.  "If that party was not diligent, the inquiry should end."  *Id.*

Extension of deadlines in this case was also governed by District of Nevada Local Rule 26-4, which provides that a "motion or stipulation to extend any date set by the discovery plan, scheduling order, or other order must . . . be supported

---

[3] We note in passing without commenting further that this argument, as well as Defendants' laches defense, is predicated on BB&T's "waiting too long" before commencing foreclosure proceedings.  This is directly contrary to Defendants' argument under Part V.A, above, that BB&T breached the covenant of good faith and fair dealing in the work-out agreements by commencing foreclosure proceedings too early without giving Defendants time to execute a work-out plan.

by a showing of good cause for the extension." D. Nev. LR 26-4. If the request to extend a deadline is made "after the expiration of the subject deadline," the movant must also demonstrate "that the failure to act was the result of excusable neglect." *Id.* The case law does not discuss the definition of excusable neglect in this context, but in the context of a motion under Rule 60(b)(1) of the Federal Rules of Civil Procedure, "whether neglect is excusable . . . depends on at least four factors: (1) the danger of prejudice to the opposing party; (2) the length of the delay and its potential impact on the proceedings; (3) the reason for the delay; and (4) whether the movant acted in good faith." *Bateman v. U.S. Postal Serv.*, 231 F.3d 1220, 1223–24 (9th Cir. 2000).

Defendants have demonstrated neither good cause nor excusable neglect. The defenses and counterclaim they sought to add were based on the work-out agreement, which Defendants knew about long before the deadline to amend had passed. Defendants were thus not diligent. The district court did not abuse its discretion in concluding that Defendants did not demonstrate good cause. That, on its own, was a sufficient reason to deny Defendants' motion.

With regard to excusable neglect, Defendants go on at length in their briefs about why their proposed amendment would not prejudice BB&T. They argue that because the amendments were based on the same facts as affirmative defenses that had already been pled, no additional discovery would be required. Whether or not this is true, Defendants provide no explanation at all for their delay. The "reason for the delay" factor of excusable neglect has thus not been addressed at all. Absent any explanation for the delay, the district court acted within its discretion in concluding that

Defendants' neglect was not excusable and thus in denying the motion to extend the deadline.

## VII.  RIGHT TO JURY TRIAL

In the *Regena* and *Smoke Ranch* Actions, the district court granted summary judgment on liability to BB&T and left the amount of damages (the deficiency) for trial.  The district court decided to determine the fair market value of the Regena and Smoke Ranch properties itself rather than submitting the issue to a jury, as Defendants demanded. Defendants contend that the district court violated their Seventh Amendment right to a jury trial by not submitting the fair market value issue to a jury.[4]

Under the Seventh Amendment, the right to a jury trial exists in "Suits at common law."  U.S. CONST. amend. VII. This means that the right applies to actions analogous to those historically tried in courts of law as opposed to courts of equity.  *Tull v. United States*, 481 U.S. 412, 417 (1987).  To determine whether the right applies to a statutory action, courts first "compare the statutory action to 18th-century actions brought in the courts of England prior to the merger of the courts of law and equity."  *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 42 (1989) (quoting *Tull*, 481 U.S. at 417).  Second, courts "examine the remedy sought and

---

[4] Prior to the deficiency trial, Defendants in the *Regena* Action stipulated to the fair market value of the Regena property, the very issue on which they had demanded a jury trial, and the amount of the deficiency was determined on that basis.  Parties are bound by their stipulations. *Payne v. Norwest Corp.*, 185 F.3d 1068, 1071–72 (9th Cir. 1999). Defendants' stipulation of fair market value rendered trial of that issue, whether by jury or otherwise, moot in the *Regena* Action.  We therefore address this issue only as it relates to the *Smoke Ranch* Action.

determine whether it is legal or equitable in nature."  *Id.* (quoting *Tull*, 481 U.S. at 417–18).  "The second stage of this analysis is more important than the first."  *Id.*

Nevada law allows the holder of a secured debt to institute a deficiency action for the lesser of (1) the difference between the amount of the debt and the fair market value of the property at the time of sale; or (2) the difference between the amount of the debt and the actual amount for which the property was sold.  Nev. Rev. Stat. § 40.459(2).  Nevada law appears to contemplate that fair market value in deficiency actions will be determined by the court, not by a jury.  Nev. Rev. Stat. § 40.457(1) ("Before awarding a deficiency judgment under NRS 40.455, the court shall hold a hearing and shall take evidence presented by either party concerning the fair market value of the property sold as of the date of foreclosure sale.").    The Seventh Amendment analysis confirms that this is the appropriate procedure.

At common law, the holder of a secured debt could pursue an action by selling the property at a trustee's sale. *McMillan v. United Mortg. Co.*, 412 P.2d 604, 605 (Nev. 1966).  After the sale, the lender could bring a deficiency action for the difference between the balance due on the note and the sales price at the trustee's sale.  *See, e.g.*, Restatement (Third) of Property: Mortgages § 8.4, Reporters' Note to cmt. a ("Several states continue to adhere to the common-law rule that when a foreclosure sale does not yield at least the amount of the mortgage obligation, the mortgagee is entitled to a deficiency judgment measured by the difference between the foreclosure price and the mortgage obligation.").    The concept of measuring deficiency by the difference between the debt and the fair market value of the property has no place at common law.  Although there is no Nevada law on the

subject, in other states the fair market value of the property was a consideration in equitable actions.  *See, e.g.*, *M & I Marshall & Ilsley Bank v. Sunrise Farms Dev., LLC*, 737 F.3d 1198, 1200 (8th Cir. 2013).

Thus, while the nature of the action may be legal, the nature of the remedy calculated based on fair market value is equitable.  As the nature of the remedy is the more important consideration under the Seventh Amendment, Defendants were not entitled to a jury trial on the fair market value of the property.

## VIII. NOTICE TO TRUST BENEFICIARIES

Nev. Rev. Stat. § 163.120(2) provides:

> A judgment may not be entered in favor of the plaintiff in the action unless the plaintiff proves that within 30 days after filing the action, or within 30 days after the filing of a report of an early case conference if one is required, whichever is longer, *or within such other time as the court may fix*, and more than 30 days before obtaining the judgment, the plaintiff notified each of the beneficiaries known to the trustee . . . of the existence and nature of the action.

(emphasis added).  Defendants contend that in the *D.M.S.I.* and *Smoke Ranch* Actions, BB&T failed to provide notice to the beneficiaries of the defendant trusts, and that the claims against the trusts should therefore have been dismissed.

As BB&T correctly notes, Nev. Rev. Stat. § 163.120 permits the court to set the time for notice. The district court in these cases determined that the notice requirement was met by the service of the complaint and by a letter of August 29, 2013. Judgment in the cases was not entered until approximately two years after this letter, well before the 30-day limit in the statute. BB&T therefore did not violate § 163.120 in the *D.M.S.I.* or *Smoke Ranch* Actions.

## IX.  CONCLUSION

For the reasons explained herein, the judgments of the District Court in each of these actions is **AFFIRMED.**