

# NUMBER 13-16-00496-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

ELAYNE MATTAR, INDIVIDUALLY;
J&E EUBANKS, INC.; ELAYNE MATTAR,
TRUSTEE OF THE JAMES E. EUBANKS
AND VIRGINIA L. EUBANKS FAMILY
TRUST; MARK MAXIMILLIAN MILAM,
INDEPENDENT EXECUTOR OF THE
ESTATE OF JAMES E. EUBANKS,
DECEASED; AND MARK MAXIMILLIAN
MILAM, INDEPENDENT EXECUTOR OF
THE ESTATE OF VIRGINIA L. EUBANKS,
DECEASED,                                                    Appellants,

v.

BBVA COMPASS BANK, NA,                                        Appellee.

On appeal from the 103rd District Court
of Cameron County, Texas.

# MEMORANDUM OPINION

**Before Justices Rodriguez, Contreras, and Hinojosa**
**Memorandum Opinion by Justice Rodriguez**

This lawsuit concerns a loan issued to George and Virginia L. Eubanks by appellee BBVA Compass Bank, NA ("the Bank").[1] The loan was secured by land associated with the Eubanks family farm in south Texas. Appellants are Virginia's descendants and various entities formed by members of the Eubanks family (collectively, "the Eubanks").[2]

The Eubanks filed suit against the Bank challenging the family's loan obligations and alleging tortious conduct. Pursuant to a jury verdict, the trial court rendered a take-nothing judgment in favor of the Bank and awarded the Bank attorney's fees. By nine issues, the Eubanks challenge the judgment. We affirm in part and reverse and remand in part.

## I. BACKGROUND

The loan that is the subject of this appeal initiated as a short-term loan in December 2004, in the amount of $1,775,000. The loan was renewed several times over the years, and Virginia pledged her land as collateral for the renewals. The most recent renewal occurred in 2008, at which time Virginia again executed a deed pledging her land as collateral (together, "the 2008 note"). Virginia passed away in 2008, and her daughter Elayne Mattar began making payments to the Bank.

---

[1] The loans in this case were originated and maintained by Texas State Bank, which later merged with BBVA Compass Bank. We refer to Texas State Bank and all predecessor entities as "the Bank."

[2] Appellants are the family's corporation J&E Eubanks, Inc.; Elayne Mattar, who filed suit individually and as trustee of the James E. Eubanks and Virginia L. Eubanks Family Trust; and Mark Maximillian Milam, who filed suit as independent executor of the estate of James E. Eubanks ("Jim"), Deceased and the estate of Virginia L. Eubanks, Deceased.

After the Bank attempted to foreclose on the family land, the Eubanks filed suit, challenging the validity of the Bank's security interest in the family land. They alleged that the Bank violated its special duty of good faith and fair dealing to Virginia, whom they described as an elderly, vulnerable widow, whose love for her ailing son George was exploited by the Bank. The Eubanks also alleged that the 2008 note: (1) was unconscionable; (2) had already been released; and (3) was executed without authority. The Eubanks' suit was tried before a Cameron County jury in 2016.

## A. The Bank's Witnesses

### 1. Tim Gilles

Tim Gilles testified that he met the Eubanks in 1980, and handled their borrowing as a vice president and later as president of the Bank's predecessor. Gilles testified that Virginia, her husband Jim, and their son George ran a successful farming operation through the family's corporation J&E Eubanks, Inc. Jim handled the decisions concerning planting and harvesting, and Virginia handled crop sales and financing. Virginia held a college degree and was a realtor. According to Gilles, the operation was so profitable that Jim was sometimes able to finance the considerable expenses of running the farm without the Bank's assistance, and the Eubanks—through their family corporation—acquired several hundred acres of land in south Texas. In the event of an occasional crop failure or financial shortfall, the Eubanks would obtain a loan from the Bank, which would be paid off over the course of several seasons. Gilles testified that the Bank viewed the Eubanks as a sound investment, due to their thirty-year record of success.

3

According to Gilles, Jim became ill at some point in the 1990's and retired from the farm, leaving George and Virginia in charge. Jim passed away in 2004, at which point Virginia became president of the family's corporation and executor of Jim's estate.

Gilles testified that between 2003 and 2004, George suffered personally from his father's death, as well as from a costly divorce, a serious car accident, and the failure of two crops. Gilles also testified that Elayne described her brother George as having an alcohol problem.

Gilles further testified that near the end of 2004, George and Virginia approached him about obtaining a sizeable loan to consolidate the Eubanks' debts and to provide funds for the next year's farming. The Bank was amenable, and it approved the first loan for $1,775,000 in December 2004.[3] Gilles testified that the majority of the loan was dedicated to paying George's debts, both business and personal. George and Virginia brought bills, taxes, and debts to the Bank, which the Bank paid with draws from the loan.

The loan became due in early 2005. It was described as a "bridge loan"—that is, a loan for a short period of time until a longer-term loan could be arranged. George renewed the bridge loan in February 2005 with another short-term bridge loan, and he did so again in April (together, "the bridge loans"). George took personal liability for the bridge loans, and Virginia executed a deed of trust which pledged several hundred acres of her land as collateral for the renewals.

---

[3] The security instrument for the first loan described $5.1 million in collateral, including the farm's equipment, accounts, and lands. This collateral did not include Virginia's land.

4

Finally, a long-term renewal was executed in June 2005, along with a corresponding deed of trust encumbering the Eubanks' collateral (together, "the 2005 note"). Gilles testified that the 2005 note was to be repaid over the course of fifteen years, though it was set to mature and require renewal in 2008 to allow for the adjustment of the interest rate. This time, Virginia pledged additional land in exchange for the 2005 note, amounting to nearly 400 acres in total. Gilles testified that the Bank prepared the necessary documents for the 2005 note, including documents stating that the directors of the family corporation approved the transaction at a board meeting in October 2005.

Gilles testified that the apparent inconsistency in dates in the 2005 note—which was executed in July 2005, but described a board-approval process that occurred in the future, in October 2005—must have been a typographical error.

Gilles testified that the Eubanks made payments on the 2005 note in 2006 and 2007. During that time, Virginia sold a portion of her land and used the profit to pay down the debt, as Gilles testified that she had planned. As a result, the 2005 note was on track to be paid off in eight years rather than the fifteen years originally anticipated. Gilles attested that he left the Bank before the 2005 note matured, but before his departure, he recommended that the renewal be approved.

Gilles explained that when the 2005 note matured, Virginia renewed the 2008 note on her own, taking sole personal liability for the first time, and executed a deed reaffirming that much of her land was encumbered by the 2008 note. The 2008 note had a principal amount of $1,294,500, and it obliged Virginia to repay that sum with interest by February

5

2011. George did not sign the 2008 note, but he did sign the 2008 deed of trust. Virginia passed away in May 2008.

### 2. James Roberson

James Roberson testified as the Bank's representative, and he corroborated much of Gilles's testimony. Roberson stated that from the Bank's perspective, the 2005 loan seemed reasonable in light of the Eubanks' history of success, the strength of their collateral, and the seemingly temporary nature of the farm's problems. He further stated that, given Virginia's financial status and reputation as a prominent realtor, the Bank viewed Virginia as creditworthy rather than vulnerable. Under that perspective, Roberson believed there was no need to warn Virginia against pledging her land.

## B. The Eubanks' Witnesses

### 1. The Milams

Virginia's grandsons Matthew and Mark Milam testified concerning their experience working at the family farm. Matthew began working at the farm in October of 2003, and Mark began in 2004. The Milams testified that when they started, Virginia had no role in managing the farm, but that their uncle George handled many aspects of the family business. However, both Milams soon realized that George had problems with substance abuse. According to the Milams, George's behavior became erratic and aggressive, often disappearing from the farm for days. The Milams attested that the farm's affairs were neglected, and its accounts with vendors went into arrears.

Matthew stated George was seriously injured in a 2004 car accident, and with George often absent, he began to forge George's signature on payroll checks. Matthew

testified that Gilles approved of this practice, and the Bank never returned any of the forged checks.

Matthew testified that in the fall of 2004, he attended a meeting where Gilles proposed to George and Virginia that they should take out a large loan to pay off and consolidate their outstanding debts, with Virginia committing real estate as collateral. Matthew testified that in December of 2004, he forged George's name on the documents for the first bridge loan. He testified that he did so based on Gilles's instructions and based on his fear that the farm would soon fold without operating capital.

According to Matthew, George abruptly fired him from his position as office manager in January 2005, and Mark assumed that job. Mark testified that toward the end of 2005, he began to assume greater responsibility over the farm's managerial decisions. Throughout these years, the Milams testified that much of the planting and related labor was run by the farm's foreman Joe Rodriguez.

Mark explained that in 2006, during a visit to the Bank, he told Gilles of George's worsening condition. Mark explained that George would not show up at the farm for weeks at a time, and Virginia was attempting to get him psychological help for his substance abuse.

Mark further testified that he updated Gilles on George's condition in 2007. He explained that George was no longer allowed to drive due to the family's fear that George, who was heavily medicated, would get into another collision. Mark also stated that he witnessed George behaving strangely at the Bank's attorney's office when Virginia signed

7

the 2008 note renewal. Nevertheless, he agreed that no one had ever attempted to have George declared incompetent or removed as trustee of the family's trust.

### 2. Elayne

Elayne testified that in 2004, her brother George's declining health and deepening substance abuse impaired his ability to oversee the farm. She testified that after George's car wreck, he moved into Virginia's house, and Virginia took care of him until her death in 2008, at which point Elayne took care of him. According to Elayne, the car wreck limited his mobility and allowed him to visit the farm only occasionally.

Elayne testified that before her death, Virginia was generally unequipped to oversee the farm herself. She explained that throughout her youth, Virginia had virtually no role in managing the farm; instead, she was a school librarian during her early career and later a realtor, but never a farmer.

Elayne did not dispute that Virginia was generally healthy and had mental capacity to sign the 2005 and 2008 notes. Instead, Elayne testified that she questioned the wisdom of Virginia's decisions, stating that her mother was mistaken in believing that by helping George with his debt, the farm would resume successful operation. However, she agreed that Virginia had a right to pledge her finances to assist with George's debt.

### 3. George

George offered a similar assessment of Virginia: that she was overly optimistic concerning the farm's prospects, but that she certainly had mental capacity, good health, and self-sufficiency up until her death. He assessed Gilles much differently than the other Eubanks: he testified that he worked with Gilles for twenty years and viewed Gilles

8

as an honest man.  George was not aware of the Bank having done anything wrong during the transactions at issue in this lawsuit.

As to his own situation, George agreed that personal problems—including his injuries and substance abuse—prevented him from managing the farm effectively, which led Virginia and Mark to take a greater role in managing the farm's finances.  George testified that he gave Mark authority to sign checks on his behalf, though he agreed that he signed the bridge loans and the 2005 note and 2008 deed himself.

## C.    Jury Findings

At the conclusion of trial, the jury returned a verdict finding that "the loan transaction" was unconscionable.  However, the jury found that the Bank's unconscionable conduct did not cause any damages to Virginia or the family corporation.

The jury also found there was a "special relationship of trust and confidence" between Virginia and the Bank, and that the Bank breached that relationship. Nonetheless, the jury found that that breach did not cause any actual damages to Virginia.

Shortly after the jury returned its verdict, the Eubanks filed a "Motion for Judgment on the Jury Verdict and to Disregard Certain Answers of the Jury."   The trial court denied the Eubanks' motion.

Instead, based on the jury's findings, the trial court rendered judgment in favor of the Bank.   Within the judgment, the trial court incorporated the jury's finding that neither the Bank's "unconscionable conduct nor the breach of the special relationship was a proximate cause of actual damages to Plaintiffs," and because both of the Eubanks' main causes of action had failed, the trial court determined that the verdict of the jury was for the Bank and against the Eubanks.   The judgment ordered that the Eubanks take nothing

by their claims and instead awarded the Bank attorney's fees in the amount of $422,000. This appeal followed.

## II.    UNCONSCIONABILITY

By their first issue, the Eubanks argue that the "Trial Court erred in denying Plaintiffs' Motion to Enter Judgment, because the evidence was sufficient to sustain the Jury's answer to Jury Question 1 finding that the 2008 loan was unconscionable and therefore unenforceable."    The Eubanks generally contend that the 2008 note is unenforceable as an unconscionable agreement because the Bank exploited Virginia as an elderly, vulnerable widow in poor financial condition.    The Bank responds that the 2008 note is not unconscionable.    We agree with the Bank.

### A.    Applicable Law

"The ultimate question of unconscionability of a contract is one of law, to be decided by the court."    *Hoover Slovacek LLP v. Walton*, 206 S.W.3d 557, 562 (Tex. 2006); *see In re Poly-Am., LP*, 262 S.W.3d 337, 349 (Tex. 2008) (orig. proceeding); *see also Venture Cotton Co-op. v. Freeman*, 435 S.W.3d 222, 228 (Tex. 2014) (defining the standard of review for unconscionability under the UCC as a question of law, though a "highly fact-specific" one).    We apply a de novo standard of review in determining whether a contract is unconscionable.    *Delfingen US-Tex., LP v. Valenzuela*, 407 S.W.3d 791, 798 (Tex. App.—El Paso 2013, no pet.); *see also Hudson Ins. Co. v. Bruce Gamble Farms*, No. 13-15-00098-CV, 2015 WL 6758654, at *4 (Tex. App.—Corpus Christi Nov. 5, 2015, no pet.) (mem. op.).

Courts do not ordinarily inquire into the reasons for a contract or the relative fairness of its terms.    *Venture Cotton*, 435 S.W.3d at 228.    However, grossly unfair

10

bargains should not be enforced. *Id.* Unconscionable bargains are therefore an exception to Texas's well-recognized preference for freedom of contract. *Id.* "The principle is one of the prevention of oppression and unfair surprise and not of disturbance of allocation of risks because of superior bargaining power." *In re Olshan Found. Repair Co., LLC*, 328 S.W.3d 883, 892 (Tex. 2010) (orig. proceeding).

Texas recognizes both substantive and procedural unconscionability. *Id.*; *see Royston, Rayzor, Vickery, & Williams, LLP v. Lopez*, 467 S.W.3d 494, 499 (Tex. 2015) (combined appeal & orig. proceeding) ("[A]greements may be either substantively or procedurally unconscionable, or both."). Substantive unconscionability refers to the fairness of the agreement itself, whereas procedural unconscionability refers to the circumstances surrounding adoption of the agreement. *See Olshan Found.*, 328 S.W.3d at 892.

The term "unconscionability" defies precise legal definition because "it is not a concept, but a determination to be made in light of a variety of factors not unifiable into a formula." *Venture Cotton*, 435 S.W.3d at 228. Depending on context, factors that may be considered include the commercial atmosphere in which the agreement was made, the alternatives available to the parties, the parties' ability to bargain, any illegality or public-policy concerns, and the agreement's oppressive or shocking nature. *Id.*; *see, e.g.*, *Ski River Dev., Inc. v. McCalla*, 167 S.W.3d 121, 136 (Tex. App.—Waco 2005, pet. denied) (listing similar factors, and also considering "any gross disparity in the values exchanged," signs that one party did not willingly "assent to the unfair terms," "knowledge of the stronger party that the weaker party will be unable to receive substantial benefits

11

from the contract," and "knowledge of the stronger party that the weaker party is unable reasonably to protect his interests by reason of" infirmities or ignorance).

## B.    Analysis

The Eubanks assert that the 2008 note was both substantively and procedurally unconscionable, and therefore unenforceable.   As to the procedural aspect, the Eubanks primarily rely on evidence concerning the adoption of the bridge loans and the 2005 note. The jury heard evidence that Matthew forged George's signature on the first bridge loan in December 2004 at Gilles's urging, using Bank-prepared forms, and he did so while the family farm was in poor financial condition.   There was also evidence that Gilles approached George and Virginia the year Jim died—soon after George was seriously injured in a car wreck—and proposed that Virginia encumber her land.   We agree that this evidence concerning the 2005 note is somewhat relevant to the alleged unconscionability of the 2008 note, since the two notes are part of the same transaction. The Eubanks also question whether George had the ability to bind the family corporation, given that the 2005 note was executed in July 2005, but according to documents drafted by the Bank, the note bound the family corporation through a corporate resolution that was supposedly passed later, in October 2005.   As to substantive unconscionability, the Eubanks argue that the terms of the 2008 note were grossly unfair to Virginia, whom they portray as an ailing widow with no skill in farming.   The Eubanks fault the Bank for renewing the note in 2008 without providing Virginia with any additional operating capital, once the nature of George's situation had become clear to the Bank.

Nonetheless, we find the record evidence cited by the Eubanks inadequate to establish an unconscionable agreement, especially when compared to the evidence that

12

the loans were fair agreements between willing and competent parties. George testified that he gave Matthew authority to sign documents on his behalf, and even if the signatures on the first bridge loan were "forged," Virginia was not involved in that transaction in December 2004. Instead, she first pledged collateral in February of 2005, at which point George himself signed a bona fide renewal with substantially similar terms. By that time, George had already accrued a sizeable debt. Witnesses testified that, in response to George's request for help, the Bank immediately issued a significant amount of operating capital to help George and Virginia consolidate the debt and save the family farm. In exchange, the Bank was to receive repayment and 7.5% interest which, the evidence suggests, they fully expected to collect. Internal documents showed that the Bank projected improvement in the Eubanks' operation, and there was no evidence that, at that time, the Bank had any reason to suspect George of substance abuse. Indeed, the Bank had no apparent reason to believe that George's other personal problems would be anything more than temporary setbacks in an otherwise successful thirty-year relationship with the Eubanks farm. There was no specific evidence that Gilles exerted any improper influence on Virginia in 2005; instead, George testified that he viewed Gilles and the Bank as honest and blameless.

The Eubanks allege the 2008 note was substantively unconscionable because there was no longer any hope of the note being repaid through farming. However, by that time, Virginia had already received the primary benefit of her bargain: $1,775,000 in operating capital in 2005, and the chance for her son to resolve his debt and restore the family farm. Virginia had already significantly indebted herself to the Bank in 2005

13

by collateralizing nearly 400 acres of her land; and according to appraisals just before the 2008 note, Virginia's land holdings represented over 95% of her personal wealth of roughly $2,700,000. In exchange for the 2008 note, Virginia received an extension on her land-liability, and with it, the chance to maximize her land's value through agreed sales rather than foreclosure.

Based on our de novo review, we cannot conclude that the 2008 note was procedurally or substantively unconscionable. *See Olshan Found.*, 328 S.W.3d at 892; *Hoover Slovacek*, 206 S.W.3d at 562. On that basis, the trial court did not err in denying the Eubanks' motion to enter judgment. We overrule the Eubanks' first issue.

Having found that the 2008 note was not unconscionable, we need not consider the Eubanks' second and third issues.[4] *See* TEX. R. APP. P. 47.1.

### III. SPECIAL RELATIONSHIP

In their fourth issue, the Eubanks complain that the trial court "erred in denying Plaintiffs' Motion for Judgment, because the evidence was sufficient to sustain the Jury's answer to Jury Questions 11 and 12 finding that there was a special relationship of trust and confidence between Virginia Eubanks and the Bank and that the Bank breached that special relationship." The Bank responds that, as a matter of law, there was no breach of a special relationship. We agree with the Bank.

### A. Applicable Law

---

[4] By their second issue, the Eubanks argue that the jury's causation finding—i.e., their finding that the Bank's unconscionable conduct did not cause any actual damages to Virginia or the family corporation—was against the great weight of the evidence. By their third issue, the Eubanks contend that the trial court erred in denying their request for a declaration that the 2008 note was unconscionable and unenforceable.

14

Because the issue of whether one has a duty to act in good faith is a question of law, our review is de novo. *El Paso Nat. Gas Co. v. Minco Oil & Gas, Inc.*, 8 S.W.3d 309, 312 (Tex. 1999). The duty of good faith and fair dealing merely requires the parties to deal fairly with one another and does not encompass the often more onerous burden that requires a party to place the interest of the other party before his own, as attributed to a fiduciary duty. *Crim Truck & Tractor Co. v. Navistar Int'l Transp. Corp.*, 823 S.W.2d 591, 594 (Tex. 1992). In Texas, a duty of good faith and fair dealing is not imposed in every contract. *City of Midland v. O'Bryant*, 18 S.W.3d 209, 215 (Tex. 2000). Such a duty may arise in certain "special relationships" which are marked by shared trust or an imbalance in bargaining power. *Fed. Deposit Ins. Corp. v. Coleman*, 795 S.W.2d 706, 708–09 (Tex. 1990); *see Victoria Bank & Tr. Co. v. Brady*, 779 S.W.2d 893, 902 (Tex. App.—Corpus Christi 1989) (cataloging recognized special relationships, such as insurer-insured, joint venturers, partners, etc.), *aff'd in part, rev'd in part on other grounds*, 811 S.W.2d 931 (Tex. 1991).

Ordinarily, a "debtor-creditor relationship does not give rise to" a duty of good faith and fair dealing. *Victoria Bank*, 779 S.W.2d at 902; *see UMLIC VP LLC v. T&M Sales & Envtl. Sys., Inc.*, 176 S.W.3d 595, 612 (Tex. App.—Corpus Christi 2005, pet. denied) (quoting *Coleman*, 795 S.W.2d at 709). There is a seldom-used exception to this rule: when a special relationship between a borrower and lender has been found, it has rested on extraneous facts and conduct, such as excessive lender control over, or influence in, the borrower's business activities. *Davis v. West*, 317 S.W.3d 301, 312 (Tex. App.—Houston [1st Dist.] 2009, no pet.); *see also Falcon Int'l Bank v. Cantu*, No. 13-13-00577-

15

CV, 2015 WL 1743396, at *12 (Tex. App.—Corpus Christi Apr. 16, 2015, no pet.) (mem. op.). "Texas courts have been reluctant to find a special relationship in [this] context." *K3C Inc. v. Bank of Am., NA*, 204 Fed. Appx. 455, 461 (5th Cir. 2006) (per curiam); *see*, *e.g.*, *Falcon Int'l*, 2015 WL 1743396, at *12 (finding no special relationship between a creditor and debtor, despite evidence that the lender oversaw the use of borrowed funds).

## B.    Analysis

The Eubanks contend that there was sufficient evidence of a special relationship between Virginia and the Bank.   As support, the Eubanks cite testimony at trial linking Virginia's extended family with various employees of the Bank.   There was testimony, for instance, that Virginia's granddaughter was good friends with Gilles's daughter.   This evidence has little bearing on Virginia's relationship with the Bank.

Rather, there was negligible evidence of "excessive lender control over, or influence in, the borrower's business activities."   *Davis*, 317 S.W.3d at 312.   According to the Eubanks and their witnesses, Virginia's "business" was solely that of librarian and realtor, and she had no connection with the family farm.   Under that assumption, there was no evidence that Bank had a relationship with Virginia's business at all.

In the alternative, even assuming that Virginia did have a substantial role in the farm, there was little evidence that the Bank exerted control over the management of the farm.   At most, the Bank urged George and Virginia to sign and pledge collateral for loans, which were to be used to pay debts arising from the farm as well as George's personal life.   This establishes nothing more than a debtor-creditor relationship, which does not give rise to a duty of good faith and fair dealing.   *See Victoria Bank*, 779 S.W.2d at 902.

16

We find the evidence insufficient to establish a special relationship between Virginia and the Bank. We overrule the Eubanks' fourth issue. Having found that there is insufficient evidence to show a special relationship, this renders it unnecessary to consider the Eubanks' fifth issue, which depends upon a finding of a special relationship.[5] *See* TEX. R. APP. P. 47.1.

## IV. RELEASE OF LIEN

By their sixth issue, the Eubanks assert that the trial court erred in denying a directed verdict on the ground that the 2008 note was invalid due to a prior release of lien. The Eubanks assert that the Bank executed a broad release-of-lien that, perhaps inadvertently, eliminated the Bank's ability to rely on Virginia's deeds of trust as security.

In August 2005, the Bank signed a release-of-lien with broad language:

Holder of the notes and liens acknowledges their payment and releases the property from the liens and from *all liens* held by Holder of the notes and liens without regard to how they were created or evidenced.

Holder of the notes and liens expressly releases all present and future rights to establish or enforce the liens as security for the payment of any future or other advances.

(Emphasis added). The Eubanks point out that by August 2005, Virginia had already signed two deeds of trust, one in February 2005 and another in June of 2005. The Eubanks argue that the term "all liens" must include both deeds of trust. The Bank responds that the Eubanks read the release too broadly; the Bank argues that the rest of

---

[5] By their fifth issue, the Eubanks challenge the jury's finding that the breach caused no damages, arguing that this finding is against the great weight of the evidence.

17

the release specifically refers only to the deed that Virginia executed in February 2005, and the Eubanks have taken the phrase "all liens" out of context.[6]

We need not decide whether the Bank or the Eubanks have interpreted the release correctly. Even assuming that the Eubanks are correct and both deeds of trust from 2005 were extinguished, Virginia executed another deed of trust in 2008, and it is that deed which the Bank relies upon in this litigation.

However, the Eubanks argue that by rule, Virginia was prevented from renewing the lien, regardless of the release's language. They argue that under Texas law, executing a release permanently extinguishes the secured party's interest, such that it is impossible to later renew any security. The Eubanks cite no authority for this proposition.

The Eubanks appear to be arguing by analogy to a rule that has been applied to statutory mechanic's liens on real property. *See Apex Fin. Corp. v. Brown*, 7 S.W.3d 820, 830 (Tex. App.—Texarkana 1999, no pet.). In *Apex*, it was said that once a mechanic's lien is released or waived, the "statutory lien cannot be revived." *Id.*; *Lyda Swinerton Builders, Inc. v. Cathay Bank*, 409 S.W.3d 221, 232 (Tex. App.—Houston [14th Dist.] 2013, pet. denied) (same, citing *Apex*); *see also Roberts v. Dixon*, No. 12-15-00181-CV, 2016 WL 900205, at *2 (Tex. App.—Tyler Mar. 9, 2016, no pet.) (mem. op.) (same, citing *Apex*).

---

[6] According to the Bank, the rest of the release consistently refers to only one lien—the February 2005 deed of trust—and the Bank urges us to read the passage quoted by the Eubanks as referring only to that deed, pursuant to the principle of *ejusdem generis*. *See Ross v. St. Luke's Episcopal Hosp.*, 462 S.W.3d 496, 504 n.1 (Tex. 2015) ("[T]he rule of *ejusdem generis* . . . provides that when words of a general nature are used in connection with the designation of particular objects or classes of persons or things, the meaning of the general words will be restricted to the particular designation.").

The rule applied in *Apex* is inapplicable to these facts. The *Apex* court relied upon the provisions of the mechanic's lien statute in reaching its holding, but that statute does not apply here. *See Apex*, 7 S.W.3d at 830–31; *see also* TEX. PROP. CODE ANN. § 53.001(5) (West, Westlaw through 2017 1st C.S.). Indeed, the *Apex* court recognized that though an extinguished mechanic's lien could not be revived *as a mechanic's lien*, the same lien could be revived as *another form of security interest*—there, a constitutional lien. *See Apex*, 7 S.W.3d at 830–31. Because this case involves a different form of security interest, Virginia was not prevented from executing another note to renew the debt or another deed of trust to reaffirm the Bank's security interest in her land. *See, e.g., Doss v. Homecoming Fin. Network, Inc.*, 210 S.W.3d 706, 709–10 (Tex. App.—Corpus Christi 2006, pet. denied) (upholding a trial court's order reviving a lender's security interest in real property—a vendor's lien—after it had been released); *see generally Perkins v. Sterne*, 23 Tex. 561, 562 (1859). The Eubanks' argument concerning the release is unavailing.

We overrule the Eubanks' sixth issue.

### V.    SANCTIONS

By their seventh issue, the Eubanks contend that the trial court abused its discretion by not sanctioning the Bank for discovery abuse. The Eubanks moved for monetary sanctions, but never obtained a ruling or objected to the trial court's failure to rule. The question of monetary sanctions is therefore not preserved for our review. *See* TEX. R. APP. P. 33.1(a)(2).

The Eubanks also requested a spoliation instruction as a discovery sanction, which the trial court denied. They complain that the Bank did not produce documents that the

19

Eubanks deemed critical, including the minutes for the meeting wherein the Bank's loan committee approved the loans to George and Virginia.

## A.  Applicable Law

Sanctions may be imposed, after notice and hearing, on parties who refuse to respond, or who give inadequate responses, to valid discovery requests or orders. *Horizon Health Corp. v. Acadia Healthcare Co., Inc.*, 520 S.W.3d 848, 884 (Tex. 2017). Rule 215 generally leaves the decision to impose sanctions to the sound discretion of the trial court.  *Id.*  "Similarly, a trial court's refusal to impose a particular sanction can be set aside only upon a showing of a clear abuse of discretion."  *Smithson v. Cessna Aircraft Co.*, 665 S.W.2d 439, 442–43 (Tex. 1984); *EP Operating Co. v. MJC Energy Co.*, 883 S.W.2d 263, 270 (Tex. App.—Corpus Christi 1994, writ denied).  A trial court abuses its discretion if it acts without reference to any guiding rules or principles.  *Horizon Health*, 520 S.W.3d at 884.  Its judgment should be reversed only if the ruling was arbitrary or unreasonable.  *Id.*  Appellate courts must independently review the entire record to determine whether the trial court abused its discretion regarding sanctions.  *Am. Flood Research, Inc. v. Jones*, 192 S.W.3d 581, 583 (Tex. 2006) (per curiam).

The "broad discretion" granted to trial courts to impose discovery sanctions is subject to several limitations.[7]  *See Horizon Health*, 520 S.W.3d at 884.  A request for a

---

[7] In general, any sanction award must further one of the recognized purposes of discovery sanctions:  (1) to secure the parties' compliance with the rules of discovery; (2) to deter other litigants from violating the discovery rules; and (3) to punish parties that violate the rules of discovery.  *Horizon Health Corp. v. Acadia Healthcare Co., Inc.*, 520 S.W.3d 848, 884 (Tex. 2017).  A sanction must also satisfy a two-part inquiry.  *See CHRISTUS Health Gulf Coast v. Carswell*, 505 S.W.3d 528, 540 (Tex. 2016).  First, there must be a direct relationship between the improper conduct and the sanction imposed.  *Id.*  "[I]n other words, the court should examine whether punishment was imposed upon the true offender and tailored to remedy any prejudice discovery abuse caused."  *Am. Flood Research, Inc. v. Jones*, 192

spoliation instruction is subject to further restrictions.[8]  *See Petro. Sols., Inc. v. Head*, 454 S.W.3d 482, 488 (Tex. 2014).

In determining what remedy, if any, is appropriate to address a spoliation of evidence, the court should weigh the spoliating party's culpability and the prejudice to the nonspoliating party.  *Id.* at 488–89.  Prejudice is evaluated based on the spoliated evidence's relevance to key issues in the case, whether the evidence would have been harmful to the spoliating party's case (or, conversely, helpful to the nonspoliating party's case), and whether the spoliated evidence was cumulative of other competent evidence that may be used in its stead.  *Id.* at 489.  Ultimately, a trial court may submit a spoliation instruction "only if it finds (1) the spoliating party acted with intent to conceal discoverable evidence, or (2) the spoliating party acted negligently and caused the nonspoliating party to be irreparably deprived of any meaningful ability to present a claim or defense."  *Id.*

## B.    Analysis

In their motions to compel, the Eubanks detail the history of the Bank's document production.  The Eubanks' lawsuit was filed in August 2011, and sixty-three days later, the Bank produced 4,363 pages of responsive documents.  The Bank later retained additional counsel, who issued a supplemental production of 6,651 pages of documents in May 2014.  The supplement was accompanied by a letter from counsel explaining, "It

---

S.W.3d 581, 583 (Tex. 2006) (per curiam).  Second, the sanction must not be excessive relative to the conduct in question.  *CHRISTUS Health*, 505 S.W.3d at 540.

[8] To find that spoliation occurred, the trial court must make affirmative determinations as to two elements.  *See Petro. Sols., Inc. v. Head*, 454 S.W.3d 482, 488 (Tex. 2014).  First, the party who failed to produce evidence must have had a duty to preserve the evidence.  *Id.* "Such a duty arises only when a party knows or reasonably should know that there is a substantial chance that a claim will be filed and that evidence in its possession or control will be material and relevant to that claim."  *Id.* (editorial marks omitted).  Second, the nonproducing party must have breached its duty to reasonably preserve material and relevant evidence.  *Id.*  A party cannot breach its duty without at least acting negligently.  *Id.*

is my understanding that there have been some discussions questioning what has and what has not been produced. To avoid arguments, we are producing documents in supplementation to, and probably duplication of, what has already been produced . . . ." On January 28, 2016, counsel for the Bank again supplemented production, producing 3,619 documents "in an abundance of caution," most if not all of which were duplicative of other production.

At a hearing on the Eubanks' second motion to compel, counsel for the Bank indicated that the Bank had searched for the meeting minutes for the Bank's loan committee but could not find them. Counsel explained that the loan was issued by a predecessor entity—Texas State Bank—that later merged with BBVA Compass Bank, and it had not been easy to locate documents from Texas State Bank following the merger.

At trial, the Bank's witnesses were asked to justify the Bank's failure to produce certain documents, including the meeting minutes.[9] Roberson explained that the Bank generally made efforts to preserve loan documents, but the Bank had been unable to locate any such meeting minutes following the merger with Texas State Bank. Roberson believed it was possible the meeting minutes had been lost or misplaced, but the Bank otherwise provided all responsive documents that it was able to locate. Gilles was also asked to explain the absence of the meeting minutes. He testified that the Bank did not independently create meeting minutes; instead, the Bank simply took loan presentation

---

[9] *But see id.* ("Because the trial court bears this responsibility [to assess spoliation], evidence of the circumstances surrounding alleged spoliation is generally inadmissible at trial, as such evidence is largely irrelevant to the merits and unfairly prejudicial to the spoliating party.").

documents and stamped them as approved or disapproved, as appropriate. Gilles testified that he believed the loan presentation had been provided to the Eubanks.

At the charge conference, the trial court denied the Eubanks' request for a spoliation instruction. The trial court explained its view that the loan documents themselves, together with witness testimony, were enough to fully present the facts to the jury without the benefit of formalized meeting minutes, if any ever existed.

Based on our independent review, the record does not show that the Bank acted "with intent to conceal discoverable evidence." *See id.* Rather, the Bank-witnesses' testimony established one of two scenarios: at worst, the Bank failed to produce meeting minutes despite the Bank's best efforts to preserve and locate documents after a merger; at best, the meeting minutes *were* in fact produced, albeit as a stamped loan presentation. Neither scenario presents a case of intentional concealment or destruction. *See id.*; *see also Christerson v. Speer*, No. 01-16-00469-CV, 2017 WL 1520449, at *7 (Tex. App.—Houston [1st Dist.] Apr. 27, 2017, pet. denied) (mem. op.) (finding the trial court did not err in rejecting a spoliation instruction because "the evidence about the note in the record is that the [appellees], after a thorough search, were unable to find it").

We also agree with the trial court's assessment that the Eubanks were not prejudiced, even assuming there was a spoliation. *See Petro. Sols.*, 454 S.W.3d at 489. There was no indication that the meeting minutes contained vital information that was not cumulative of other documents (such as the projections contained within the loan paperwork) and other witness testimony (such as Roberson's testimony concerning the Bank's internal processes). Therefore, the trial court did not abuse its discretion in

finding that the Bank's wrongful actions, if any, did not cause the Eubanks "to be irreparably deprived of any meaningful ability to present a claim or defense." *See id.*; *Horizon Health*, 520 S.W.3d at 884.

Because the Eubanks did not demonstrate either situation in which a spoliation instruction is warranted, the trial court correctly denied the instruction.[10] *See Petro. Sols.*, 454 S.W.3d at 489. We overrule the Eubanks' seventh issue.

## VI. CORPORATE AUTHORITY

By their eighth issue, the Eubanks assert that the trial court erred in denying their post-judgment motion for judgment notwithstanding the verdict on the ground that George did not have authority to bind the family corporation. While the Eubanks did file certain post-judgment motions, these motions did not mention the issue of corporate authority or urge the trial court to grant JNOV on that basis. Accordingly, the Eubanks have not preserved this complaint for our review. *See* TEX. R. APP. P. 33.1(a).

## VII. ATTORNEY'S FEES

By their ninth issue, the Eubanks challenge the trial court's award of attorney's fees in the amount of $422,000 against all appellants, whom we have collectively referred to as the Eubanks. In the final judgment, the trial court based its award on the fact that "the parties stipulated to attorney's fees . . . ." The Eubanks assert, however, that only some of the Eubanks-parties stipulated to attorney's fees in documents associated with

---

[10] On appeal, the Eubanks also complain of the trial court's refusal to submit a spoliation instruction concerning the Bank's purported failure to produce other documents. However, this complaint does not conform with the Eubanks' argument at the charge conference, and it is therefore not preserved for our review. *See* TEX. R. APP. P. 33.1(a); *see, e.g.*, *Lowry v. Tarbox*, 537 S.W.3d 599, 617 (Tex. App.—San Antonio 2017, pet. denied) ("On appeal, appellants present an entirely different argument [concerning the proposed jury] question . . . .").

24

the 2008 note, whereas other Eubanks-parties never stipulated to attorney's fees. The Eubanks contend that the trial court therefore erred in entering an undifferentiated award of attorney's fees against all the Eubanks.

## A.    Applicable Law

Texas follows the American rule on attorney's fees, under which a party generally may not recover attorney's fees unless authorized by statute or contract. *In re Nat'l Lloyds Ins. Co.*, 532 S.W.3d 794, 809 (Tex. 2017) (orig. proceeding). The party seeking to recover attorney's fees carries the burden of proof. *Kingsley Props., LP v. San Jacinto Title Servs. of Corpus Christi, LLC*, 501 S.W.3d 344, 349 (Tex. App.—Corpus Christi 2016, no pet.). When a contract is not ambiguous, the construction of the written instrument is a question of law for the court. *First Bank v. Brumitt*, 519 S.W.3d 95, 105 (Tex. 2017).

## B.    Analysis

The trial court found that "the parties stipulated to attorney's fees . . . ." We agree with the Eubanks that this finding is true as to certain parties who signed the 2008 note and deed of trust. However, other parties did not sign these instruments, and the instruments therefore provide no basis to assess attorney's fees against these parties.

Specifically, the 2008 deed of trust was signed by: (1) Virginia only in her capacity as independent executrix of the Estate of James Eubanks, (2) George individually, and (3) George on behalf of the family corporation. The 2008 deed of trust provided that the grantors

> will pay all attorney's fees and expenses which may be incurred by the Noteholder in enforcing the terms of the Note and this Deed of Trust or in

25

> any suit in which the Noteholder may become a party where this Deed of Trust or the Mortgaged Premises is *in any manner involved* . . . .

(Emphasis added). It is undisputed that the Bank, as the noteholder, became a party to this suit, which "in any manner involved" the 2008 deed of trust. *See id.* Thus, the 2008 deed of trust authorized the Bank to collect attorney's fees from the grantors of the deed, who were George, Jim's estate, and the family corporation. But it does not provide a basis for the Bank to collect attorney's fees from appellants who did not sign it, including Elayne Mattar, individually and as trustee of the James E. Eubanks and Virginia L. Eubanks Family Trust, and Mark Milam, as executor of Virginia's estate. *See Nat'l Lloyds*, 532 S.W.3d at 809.

The 2008 note itself was signed solely by Virginia in her individual capacity, and it provides as follows:

> If this note is placed in the hands of an attorney for collection, or is collected through the Probate or Bankruptcy Court, or through other legal proceedings, the makers, endorsers, and/or guarantors hereof further promise to pay reasonable attorney's fees (which is agreed to be ten percent (10%) of the unpaid balance owing thereon) . . . .

As we interpret it, the 2008 note permits recovery of attorney's fees from Virginia's estate in some instances, but not others. *See First Bank*, 519 S.W.3d at 105. The trial court impliedly found that this suit was of the type that warranted an award of attorney's fees against Virginia's estate. *See Shields LP v. Bradberry*, 526 S.W.3d 471, 480 (Tex. 2017). The Eubanks do not challenge this finding; indeed, they argue in their brief that their reason for filing the instant lawsuit was "[t]he Bank's attempt to foreclose on the property" for alleged breach of the 2008 note. The 2008 note therefore permitted the Bank to seek attorney's fees from Mark Milam, as executor of Virginia's estate to the

26

extent of 10% of the balance on the 2008 note, but it did not authorize an award against Elayne Mattar or the family trust.[11]   *See Nat'l Lloyds*, 532 S.W.3d at 809.

In summary, the 2008 deed of trust authorizes attorney's fees against two parties to these proceedings:   the family corporation and Jim's estate.   The 2008 note authorizes attorney's fees against Virginia's estate, but only to the extent of 10% of the outstanding debt on the note.   None of the instruments at issue here authorize an award of attorney's fees against Elayne Mattar or the family trust.

Because the trial court awarded attorney's fees exceeding these bounds, we sustain this aspect of the Eubanks' ninth issue.[12]   This award should be reformed following a hearing to determine the amount of attorney's fees chargeable against Virginia's estate, if any.

## VIII.   CONCLUSION

We reverse the judgment of the trial court to the extent that it awards attorney's fees against:   (1) Elayne Mattar, individually and as trustee of the James E. Eubanks and Virginia L. Eubanks Family Trust; and (2) Mark Maximillian Milam, as independent executor of the estate of Virginia L. Eubanks.   We remand that portion of the judgment

---

[11] The Bank contends, in the alternative, that the award of attorney's fees is supportable under the declaratory judgment act.   The declaratory judgment act provides that a trial court may award costs and reasonable attorney's fees when doing so is equitable and just.   *Castille v. Serv. Datsun, Inc.*, __S.W.3d__, __, No. 01-16-00082-CV, 2017 WL 3910918, at *10 (Tex. App.—Houston [1st Dist.] Sept. 7, 2017, no pet.) (mem. op); *see* TEX. CIV. PRAC. & REM. CODE ANN. § 37.009 (West, Westlaw through 2017 1st C.S.). However, the trial court, in its discretion, did not determine that an award of attorney's fees would serve the interests of equity, and due to the Bank's conduct, the record does not warrant such a finding on appeal. *See Bocquet v. Herring*, 972 S.W.2d 19, 21 (Tex. 1998).

[12] Also within their ninth issue, the Eubanks contend that the trial court erred in refusing to award the Eubanks attorney's fees, because the Bank both (1) entered an unconscionable contract and (2) breached its special relationship with Virginia.   We have already determined that the 2008 note was not unconscionable and the Bank had no special relationship with Virginia.   Accordingly, we need not address this contention.   *See* TEX. R. APP. P. 47.1.

for further proceedings consistent with this opinion.   We affirm the judgment of the trial court in all other respects.

NELDA V. RODRIGUEZ
Justice

Delivered and filed the
31st day of May, 2018.